IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | P:24-CR-00236-DC |
| | § | |
| LUIS MUNIZ-ESPINOZA | § | |

## ORDER DENYING MOTION TO DISMISS

### I.    INTRODUCTION

BEFORE THE COURT is Defendant Luis Muniz-Epinoza's Motion to Dismiss,[1] which seeks dismissal of his one-count indictment, alleging a violation of 18 U.S.C. § 2423(c), (f)(1). These provisions punish American citizens who engage in noncommercial, illicit sexual conduct after traveling to a foreign country.

In the Motion, Muniz-Espinoza argues that § 2423(c) is facially invalid and invalid as applied to Muniz-Espinoza, because it exceeds the limited, enumerated powers granted to Congress by the Constitution's Commerce Clause. Courts are divided over whether Congress can constitutionally regulate noncommercial behavior by American citizens in foreign countries. The Fifth Circuit has not yet answered the question

Having reviewed the Motion and the Government's response, this Court holds that noncommercial sex with a minor abroad fairly relates to foreign commerce, and that Congress acted within its constitutional bounds when it enacted the noncommercial prong of § 2423(c). This question is a challenging one, and courts nationwide have come to varying

---

[1] Doc. 29.

conclusions regarding the constitutionality of the statute.[2] However, an in-depth analysis into this matter has convinced the Court that Congress acted appropriately under its Foreign Commerce Clause power by regulating noncommercial sexual conduct abroad because it substantially affects commerce, thus meeting the rational basis standard in *Lopez*. Because the Court finds the noncommercial prong of § 2423(c) is constitutional, Muniz-Espinoza's Motion to Dismiss is **DENIED**.

## II.    BACKGROUND

On May 17, 2024, Muniz-Espinoza, an American citizen and resident, drove from his home in Fort Stockton, Texas, to his parents' home in Ocampo, Coahuila, Mexico. Several family members were present at the house when he arrived, including Child Victim 1 ("CV"), a 14-year-old minor. Muniz-Espinoza claims that he did not know CV would be present at the house prior to his arrival. CV, also an American citizen, had traveled separately to the house with her mother and two other individuals.

At his parents', Muniz-Espinoza shared with others at the house some beer he had purchased. CV was one of those individuals. On that same evening, Muniz-Espinoza and CV drove to a cemetery, where Muniz-Espinoza, then 48 years old, engaged in sexual conduct with CV, then 14 years old. Muniz-Espinoza caused contact between his penis and

---

[2] *Compare United States v. Lindsay*, 931 F.3d 852, 862 (9th Cir. 2019) (upholding section 2423(c));
*United States v. Durham*, 902 F.3d 1180, 1210 (10th Cir. 2018) (upholding section 2423(c) under broader power than under Interstate Commerce Clause); *United States v. Bollinger*, 798 F.3d 201, 218 (4th Cir. 2015) (same), *with United States v. Pendleton*, 658 F.3d 299, 308 (3rd Cir. 2011) (upholding section 2423(c) under *Lopez/Morrison* framework), *and Durham*, 902 F.3d at 1241 (Hartz, J., dissenting) (concluding section 2423(c) exceeds Foreign Commerce Clause authority); *United States v. Reed*, 2017 WL 3208458, at *14 (D.D.C. July 27, 2017) (same); *United States v. Al-Maliki*, 787 F.3d 784, 793–94 (6th Cir. 2015) (concluding it was likely section 2423(c) was unconstitutional, but that such error was not plain).

CV's mouth and caused contact between his mouth and CV's vulva and breast. Muniz-Espinoza and CV then drove back to the parents' residence, and around 1 or 2 a.m., when other family members were asleep, Muniz-Espinoza caused contact between his penis and CV's vulva, causing penetration to occur.

The next day, Muniz-Espinoza received a phone call from his sister and wife, confronting him about the sexual intercourse between him and CV. CV and her mother then returned to the United States and made a report to the Pecos County Sheriff's Office. Defendant returned to the United States on July 12, 2024, and he was indicted for violation of § 2423 shortly after. He later filed the instant Motion.

## III.    STANDARD

Under Federal Rule of Criminal Procedure 12(b)(2), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."[3] A party must raise before trial "a motion [that] alleged a defect in the indictment or information—but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense[.]"[4]

When challenging the constitutionality of a statute, a defendant may challenge the statute either on its face, or as the statute is applied to a defendant's particular circumstances.[5] Outside of the First Amendment context, a plaintiff may only succeed in a

---

[3] Fed. R. Crim. P. 12(b)(2); *United States v. Lankford,* 196 F.3d 563, 569 (5th Cir. 1999).
[4] Fed. R. Crim. P. 12(b)(3).
[5] *See United States v. Luna,* 165 F.3d 316, 319–22 (5th Cir. 1999) (analyzing constitutionality of 18 U.S.C. § 922 both facially and as applied); *United States v. Robinson,* 119 F.3d 1205, 1213–15 (5th Cir. 1997) (holding Hobbs Act constitutional both facially and as applied to defendant).

facial challenge to the constitutionality of a statute by "establishing that no set of circumstances exists under which the Act would be valid."[6]

## IV.    RELEVANT LAW

### A.  18 U.S.C. § 2423

Section 2423(c) is one of a series of provisions enacted in the early 2000s as part of the PROTECT Act, formally known as the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act. The federal law was designed to strengthen measures protecting children from various forms of sexual exploitation and abuse.[7] It is one of four related provisions, often referred to as the "travel statutes," that criminalize travel in interstate or foreign commerce connected to sexual abuse.[8]

The first of the provisions, § 2421, criminalizes transporting an individual in interstate or foreign commerce with the intent for that person to engage in prostitution or other illegal sexual activities.[9] Section 2421's current form originated in 1910 as the Mann Act, also

---

[6] *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 449 & n. 6 (2008) (citing *United States v. Salerno,* 481 U.S. 739, 745 (1987)); *Ctr. for Individual Freedom v. Carmouche,* 449 F.3d 655, 662 (5th Cir. 2006).

[7] S. Rep. No. 108-2, at 1-2 (2003) (explaining purposes of PROTECT Act were "to restore the government's ability to prosecute child pornography offenses successfully" and "accomplish several other changes in existing law to aid in the investigation and prosecution of child pornography offenses, such as creating extraterritorial jurisdiction"); 149 Cong. Rec. 445-46 (2003) (statement of Sen. Orrin Hatch) (summarizing PROTECT Act and its goals); 149 Cong. Rec. 9079 (2003) (statement of Rep. Sue Myrick) ("The PROTECT Act sends a clear message to those who prey upon children that if they commit these crimes, they will be punished. This legislation provides stronger penalties against kidnapping, ensures lifetime supervision of sexual offenders and kidnappers of children, gives law enforcement the tools it needs to effectively prosecute these crimes, and provides assistance to the community when a child is abducted.").

[8] Jessica E. Notebaert, *The Search for a Constitutional Justification for the Noncommercial Prong of 18 U.S.C. S 2423(c)*, 103 J. CRIM. L. & CRIMINOLOGY 949, 952 (2013).

[9] 18 U.S.C. § 2421.

referred to as the White-Slave Traffic Act. The purpose behind that act was "to protect women who were weak from men who were bad,"[10] although its scope has since expanded.[11] The next provision, § 2423(a), criminalizes transporting a minor in interstate or foreign commerce with the intent that the minor engages in prostitution or any other criminal sexual activity.[12] The third, § 2423(b), criminalizes traveling in interstate or foreign commerce for the purpose of engaging in any illicit sexual conduct, as defined by statute.[13]

Lastly, § 2423(c), the provision at issue in this case, criminalizes traveling in foreign commerce and engaging in illicit sexual conduct.[14] Illicit sexual conduct is defined in § 2423(f) as:

> (1) [A] sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or (2) any commercial sex act (as defined in section 1591) with a person under 18 years of age.[15]

Combination of the § 2423(c) and (f)(2) provisions thus criminalizes, "in a nutshell, giving or receiving anything of value in exchange for any sex act with a minor."[16] This combination is referred to as the "commercial prong" of the sex tourism statute. By contrast, the combination of § 2423(c) and (f)(1) criminalizes the sexual abuse of minors, absent the

---

[10] *Wyatt v. United States*, 362 U.S. 525, 530 (1960) (quoting *Denning v. United States*, 247 F. 463, 465 (5th Cir. 1918)).

[11] Notebaert, *supra* note 8, at 952 (citing Mann Act, 36 Stat. 825 (focusing on transporting women and girls for "prostitution or debauchery"), in comparison with 18 U.S.C. § 2421 (focusing on transporting anyone for any criminal sex offenses)).

[12] 18 U.S.C. §2423(a).

[13] *Id.* §2423(b).

[14] *Id.* §2423(c).

[15] *Id.* §2423(f).

[16] Notebaert, *supra* note 8, at 952.

commercial nature of giving or receiving something of value found in § 2423(f)(2).[17] This combination is known as the "noncommercial prong" of the sex tourism statute.

One major purpose behind the PROTECT Act's enactment was to substantially revise the then-existing version of 18 U.S.C. § 2423.[18] One such revision was the addition of § 2423(c), which removed one of the biggest barriers to enforcement of § 2423(b)—the requirement that prosecutors prove that mens rea existed prior to travel.[19] Under the precursor to § 2423(c)—§ 2423(b)—prosecutors had to show that a defendant *formed the intent* to engage in illicit sexual activity *prior to his travel* in interstate or foreign commerce.[20] In other words, the addition of § 2423(c) allows a defendant to be prosecuted for traveling to a foreign country and engaging in illicit sex, *even if he has no preconceived intent to do so*.

Since its enactment, both the commercial and noncommercial prongs of § 2423(c) have been subjected to constitutional challenges, although the constitutionality of the noncommercial prong appears settled. Of paramount concern in the challenges to the noncommercial prong is the prong's wide-sweeping, extraterritorial, and non-commercial nature, which makes it a suspect byproduct of the Commerce Clause.

The PROTECT Act itself contains no jurisdictional statement, and its legislative history is devoid of explicit reference to any constitutional provision granting Congress authority to pass such sweeping legislation.[21] By contrast, "the Sex Tourism Prohibition Improvement Act (STPIA), a precursor to the PROTECT Act that was proposed but not

---

[17] *Id.* at 953.
[18] *Id.*
[19] *Id.* at 954.
[20] *Id.* This is still an element of the current version of § 2423(b).
[21] *Id.*

passed in 2002, included a 'Constitutional Authority Statement' grounding Congress's authority to pass the law in its power to regulate commerce under Article I, Section 8 of the U.S. Constitution."[22] Congress failed, whether intentionally or not, to do the same with the PROTECT Act.

Nonetheless, the majority of courts analyzing the PROTECT Act, including § 2423(c), have held that the Commerce Clause and, in the case of § 2423(c), the Foreign Commerce Clause, provide authority for the Act.[23]

### B. Foreign Commerce Clause

Muniz-Espinoza contends that the Foreign Commerce Clause does not grant Congress the authority to regulate the alleged conduct here. In other words, as Congress can only rely upon its enumerated powers in the Constitution to enact legislation, Muniz-Espinoza claims that Congress lacks the authority to criminalize his alleged conduct because the Foreign Commerce Clause does not supply that authority.

#### 1.    Current Approach to the Foreign Commerce Clause

The United States Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."[24] It also grants Congress the authority to "make all laws which shall be necessary and proper for carrying into execution the foregoing power[.]"[25]

---

[22] *Id.* (citing H.R. Rep. No. 107-525, at 5 (2002)).

[23] *See, e.g., Pendleton*, 658 F.3d at 308-311; *see also Clark*, 435 F.3d at 1103; *United States v. Bredimus*, 352 F.3d 200, 204-08 (5th Cir. 2003); *United States v. Flath*, 845 F. Supp. 2d 951, 954-57 (E.D. Wis. 2012); *United States v. Martinez*, 599 F. Supp. 2d 784, 808 (W.D. Tex. 2009); *United States v. Bianchi*, No. 06-19, 2007 WL 1521123, at *4-5 (E.D. Pa. May 22, 2007).

[24] U.S. CONST. ART. I, § 8, cl. 3.

[25] *Id.* art I., § 8, cl. 18.

The Commerce Clause is generally further broken down into three subsets of authority: the Foreign Commerce Clause, the Interstate Commerce Clause, and the Indian Commerce Clause. Which authority is implicated depends on whether Congress seeks to regulate interstate commerce, foreign commerce, or commerce with Indian tribes.

While the bounds of the Interstate Commerce Clause have been thoroughly explored by both the Supreme Court and lower courts, "[t]he Foreign Commerce Clause[, at issue in this case,] is a 'complex and largely undeveloped area of constitutional law' in which the Supreme Court's 'only iterations . . . have come in situations involving state taxation of foreign commerce.' "[26] The Fifth Circuit's own exploration of the clause is similarly limited, and it has not yet analyzed whether and to what extent, if any, the Foreign Commerce Clause authorizes Congress to legislate and criminalize actions like those at issue here. However, Supreme Court dicta indicates that "there is evidence that the Founders intended the scope of the foreign commerce power to be [ ] greater" than its interstate commerce power,[27] and that Congress's authority "when exercised in respect of foreign commerce may be broader than when exercised as to interstate commerce."[28]

When reviewing an act of Congress under the Commerce Clause, whether Interstate or Foreign, courts look to the rational basis standard.[29]  In applying this deferential standard, "due respect for the decisions of a coordinate branch of Government demands that we

---

[26] *Hartford Enters., Inc. v. Coty*, 529 F. Supp. 2d 95, 105 (D. Me. 2008) (quoting *Antilles Cement Corp. v. Acevedo Vila*, 408 F.3d 41, 46–47 (1st Cir. 2005)); *see Clark,* 435 F.3d at 1112–1113 (reviewing Congress's authority under each provision, as well as extent of that authority).

[27] *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 448 (1979).

[28] *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932).

[29] *Bredimus,* 352 F.3d at 203 (citing *Groome Res., Ltd. v. Parish of Jefferson,* 234 F.3d 192, 203 (5th Cir. 2000)).

invalidate a congressional enactment only upon a *plain showing* that Congress has exceeded its constitutional bounds."[30]

In the context of the Interstate Commerce Clause, to demonstrate a rational basis for the law at issue, *United States v. Lopez* requires that the regulated conduct conform with one of "three broad categories of activity" that Congress may regulate.[31]

In *Lopez*, the Supreme Court found that a federal statute criminalizing gun possession within 1,000 feet of a school exceeded the "outer limits" of Congress's authority under the Interstate Commerce Clause.[32] In holding the statute unconstitutional, the *Lopez* Court outlined three broad categories of activity that the Constitution allows Congress to regulate under its interstate commerce power: (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "activities having a substantial relation to interstate commerce, *i.e.*, activities that 'substantially affect' interstate commerce."[33]

As to the third category, the Interstate Commerce Clause empowers Congress to regulate "economic class[es] of activities"—even those that are "purely local"—if Congress had a "rational basis" for concluding that those activities "taken in the aggregate, substantially affect interstate commerce."[34] Congress may also "regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that

---

[30] *Bredimus,* 352 F.3d at 203 (quoting *Groome,* 234 F.3d at 216) (emphasis in quoted text).
[31] *Groome,* 234 F.3d at 203–04 (citing *Lopez,* 514 U.S. at 558).
[32] *Lopez,* 514 U.S. at 561 (holding 18 U.S.C. § 922(q)(1)(A) unconstitutional).
[33] *Id.* at 558–59; *see also Bredimus,* 352 F.3d at 206.
[34] *Raich*, 545 U.S. at 22 (internal citations and quotation marks omitted).

failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity."[35] In engaging in this inquiry, four factors are relevant:

> "(1) whether the statute regulates economic or commercial activity; (2) whether the statute contains an "express jurisdictional element" that limits the reach of its provisions; (3) whether Congress made findings regarding the regulated activity's impact on interstate commerce; and (4) whether "the link between [the regulated activity] and a substantial effect on interstate commerce was attenuated."[36]

At this time, the Supreme Court has not established a test for evaluating the constitutionality of criminal laws passed pursuant to Congress's Foreign Commerce Clause authority. However, courts appear to pick from one of several general analytical frameworks.[37] In virtually all those frameworks, the *Lopez* framework is involved.[38]

### 2.   A New Approach to the Commerce Clause?

Muniz-Espinoza seeks to sidestep *Lopez* by positing that *New York State Rifle & Pistol Association, Inc. v. Bruen* demands a complete reassessment of all current methods of constitutional analysis. *Bruen*, which concerned a law infringing the Second Amendment, requires use of a historical tradition test. This overhauled the prior two-part test, adopted by the circuit courts, that first asked whether the challenged law impinged upon a right protected by the Second Amendment, and then, if it did, considered whether to apply

---

[35] *Id.* at 18.

[36] *United States v. Morrison*, 529 U.S. 598, 610–12 (2000)).

[37] Notebaert, *supra* note 8, at 959.

[38] *See, e.g., United States v. Park*, 938 F.3d 354, 370–74 (D.C. Cir. 2019); *Lindsay,* 931 F.3d at 860–63; *Durham*, 902 F.3d at 1192–1217; *Bollinger*, 798 F.3d at 208–19; *Pendleton*, 658 F.3d at 305–11; *Bianchi*, 386 F. App'x at 160–62; *Clark*, 435 F.3d at 1110–17.

intermediate or strict scrutiny to the challenged law.[39] Under this test, the Fifth Circuit (and others) repeatedly upheld the constitutionality of many laws restricting gun possession.[40]

In place of the old test, only the first step remains—considering whether the challenged law infringes on Second Amendment rights. Once that is established, the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."[41] The government must detail "*how and why* the regulations burden a law-abiding citizen's right to armed self-defense." [42] Because the question of whether a law infringes on one's Second Amendment rights is rarely at issue, "the 'two-step' view of *Bruen* is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation."[43]

> ### a. Extension of Bruen in Vidal and Other Cases

While at first glance *Bruen* appears to guide only Second Amendment litigation, it has already impacted other constitutional litigation, although in extremely limited cases. The majority in *Bruen* (drafted by Justice Thomas) suggested that this new methodology could theoretically apply to much of the Constitution's text, requiring courts to step into the shoes of historians and render potentially uninformed decisions with life-altering effects on the parties before their courts.

---

[39] *Id.*

[40] *See, e.g., Hollis*, 829 F.3d at 446 (upholding § 922(g)(1) under two-part inquiry); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (same); *United States v. Staten*, 666 F.3d 154, 158 (4th Cir. 2011) (same).

[41] *Id.* at 465 (citing *Heller*, 597 U.S. at 17).

[42] *Bruen*, 597 U.S. at 29.

[43] *Id.* (citing *Rahimi*, 144 S. Ct. at 1898).

One such example is in the context of trademarks that use the names of living individuals without their consent. In *Vidal v. Elster*, the Supreme Court analyzed the Patent and Trademark Office's refusal to issue a patent when a petitioner claimed that the Lanham Act's prohibition on registration of a trademark that includes the name of a living individual without his consent violated the petitioner's free speech rights.[44] The decision reversed the United States Court of Appeals for the Federal Circuit that struck down the law because the prohibition "involve[d] content-based discrimination that [was] not justified by either a compelling or substantial government interest."[45] In affirming the prohibition, the Supreme Court recognized a history and tradition of restricting trademarks containing names.[46]

Outside trademarks, the Court has employed history and tradition in several other contexts, like abortion rights. In *Dobbs v. Jackson Women's Health Organization*, the Court cautioned that any right not explicitly enumerated in the Due Process Clause of the Fourteenth Amendment "must be deeply rooted in this Nation's history and tradition."[47] And Justice Thomas reminded us in *Bruen* that focus on history is not out of the ordinary for constitutional disputes.[48] As an example, when the government restricts speech, it "generally must point to historical evidence about the reach of the First Amendment's protections."[49] Further, the Sixth Amendment's Confrontation Clause "require[s] courts to

---

[44] 602 U.S. 286, 290 (2024).

[45] *In re Elster*, 26 F.4th 1328, 1331 (Fed. Cir. 2022).

[46] *Id.* at 301, 307 n.4 (citing *Bruen*, 597 U.S. at 30).

[47] 597 U.S. 215, 231 (2022).

[48] Christopher Dove, *Judges as Historians: Bruen's New Rules*, 33 App. Advoc. 26, 35 (2023).

[49] *Bruen*, 597 U.S. at 20 (emphasis added).

consult history to determine the scope of that right."[50] And to determine the application of the Establishment Clause, courts "look to history for guidance."[51]

Because under *Bruen*, all forms of means-end testing, including the "strict scrutiny" or "rational basis" standard, are rejected, leaving only the historical tradition test, adopting Muniz-Espinosa's interpretation would eliminate the standard currently used in Commerce Clause cases. Assuming then, for argument's sake, that Muniz-Espinoza's historical analysis of the Commerce Clause is correct, Congress's ability to pass laws like § 2423(c) would be severely jeopardized.

## V.    ANALYSIS

With those legal guideposts in place, the Court must now consider whether Congress may regulate noncommercial, illicit sexual conduct that a defendant engages in after having travelled in foreign commerce.

Muniz-Espinoza argues it may not. But he is not the first to call into question the constitutionality of § 2423(c). Since its enactment in 2003 and its amendment in 2013, the provision has been the subject of extensive litigation.

Courts analyzing § 2423(c) have typically upheld it pursuant to Congress's Foreign Commerce Clause powers, Congress's treaty power, or both.[52] Muniz-Espinoza argues that

---

[50] *Id.* at 25.

[51] *Id.*

[52] *See Park*, 938 F.3d at 354 (finding criminalization of commercial and noncommercial sex acts with minors under § 2423(c) necessary and proper for implementation of Optional Protocol); *Lindsay*, 931 F.3d at 852 (finding § 2423(c) did not exceed Congress's authority under Foreign Commerce Clause as applied to noncommercial sexual abuse of minor); *Al-Maliki*, 787 F.3d at 784 (upholding conviction under noncommercial prong of § 2423(c) under plain error review); *Pendleton*, 658 F.3d at 311 (holding § 2423(c) is valid exercise of

neither provides Congress the authority to criminalize conduct like that at issue here and, in addition, that this Court should ignore virtually all prior case law on the matter in light of *Bruen*, which demands an originalist approach to the Second Amendment and potentially other provisions of the Constitution.

This challenge, as posed specifically by Muniz-Espinoza, can therefore be broken down into two major subquestions: first, what standard applies to constitutional challenges to the noncommercial prong of § 2423(c), and two, under that standard, if the provision is constitutional. As to the first question, this Court must determine whether to employ the *Lopez* standard or instead be the first to extend *Bruen*, in light of *Vidal*, to the Commerce Clause.

This Court first holds that *Lopez*, not *Bruen*, should apply to constitutional challenges of § 2423(c)'s noncommercial prong. While plausible the Court intended for *Bruen* to cast a wider net—applying to all or most provisions of the Constitution—it is the job of the Supreme Court, not the district court, to overturn existing precedent. This Court therefore finds that the Supreme Court's "time-tested" framework is best suited for evaluating the constitutionality of § 2423(c).  Additionally, this Court finds that Congress possessed a rational basis for the provision's enactment as it is an essential piece of Congress's plan to combat commercial sex tourism by Americans abroad, and the provision's first element of travel abroad fairly relates to foreign commerce, even when predicated on sexual activity that is noncommercial in nature. The noncommercial prong of § 2423(c) is therefore constitutional under Congress's Foreign Commerce Clause powers.

---

Congress's power to regulate "channels of foreign commerce" under Foreign Commerce Clause).

### A. *Lopez*, not *Bruen*, Governs Challenges to § 2423.

Courts across the country have taken various approaches to analyzing the constitutionality of § 2423(c), although most have adopted *Lopez*.[53] In these cases, courts have generally upheld the provision, finding that the criminalized conduct substantially affects foreign commerce and thus passes constitutional muster. This is in line with case law that suggests any regulations of foreign commerce be afforded even greater deference than when regulating interstate commerce.[54] "In fact, the Supreme Court has never struck down an act of Congress as exceeding its powers to regulate foreign commerce."[55]

Muniz-Espinoza, however, advocates for a novel approach, which would involve constraining analysis to the historical tradition of this Nation, as has been done in the Second Amendment context post-*Bruen*. This approach would likely require this Court to strike down the provision as unconstitutional, as Muniz-Espinoza notes that the original meaning of the word "commerce" was limited to selling, buying, trading, and bartering for goods.[56] Thus, the Foreign Commerce Clause provides Congress only the authority to regulate selling, buying, bartering, and transporting for the sale, purchase, or trade of goods with foreign nations.[57]

---

[53] *E.g., Clark,* 435 F.3d at 1113; *Martinez,* 599 F. Supp. 2d at 805; *Pendleton,* 658 F.3d at 308.
[54] *See Bredimus,* 352 F.3d at 208 ("The Supreme Court has long held that Congress's authority to regulate foreign commerce is even broader than its authority to regulate interstate commerce.") (citing *Japan Line,* 441 U.S. at 448).
[55] *Clark,* 435 F.3d at 1113.
[56] *Lopez,* 514 U.S. at 585-86 (Thomas, J., concurring).
[57] Motion, at 12.

But Muniz-Espinoza's argument would require this Court to overrule decades of case law interpreting the Commerce Clause and instead look to the Commerce Clause—and potentially the entire Constitution—through a highly constricted, originalist lens.

While the Court is sympathetic to Muniz-Espinoza's argument and recognizes that a reading of some Supreme Court jurisprudence, particularly through the lens of Justice Thomas, suggests a possibility that the historical tradition test should be extended to cover either all or more provisions of the Constitution, absent clearer direction from the Supreme Court, this Court will not do so.

The Court reads *Vidal* as too weak a case to constitute precedent for extending *Bruen* to the Commerce Clause, especially considering the justices' heavily fractured reasoning behind its use of the history and tradition test in that case. As an example of what appears to be an opinion of consensus only as to the result, the Court notes that Justice Barrett suggested a reasonability standard, joined in part by several other of the justices, Justice Sotomayor advocated for a two-step analysis based on current First Amendment law, and Justice Kavanauagh, although appearing to agree with the majority, also noted that "a viewpoint-neutral, content-based trademark restriction might well be constitutional even absent such a historical pedigree." [58] Therefore, although the Court's judgment was unanimous, the fractured reasoning appears to demonstrate at least some hesitation as to how to assess the constitutionality of issues outside the Second Amendment context.

---

[58] *Vidal*, 602 U.S. at 311 (Kavanaugh, J., concurring).

As a result, this Court falls in line behind cases like *Martinez* and *Pendleton* and adopts the "time-tested" *Lopez* framework promulgated by our highest court.[59]

### 3. Section 2423(c) Under *Lopez*

Using the *Lopez* framework, the Court finds that Congress's enactment of § 2423(c) was a valid exercise of its authority under the Foreign Commerce Clause as the conduct contemplated by the statute, illegal sexual conduct, substantially affects commerce, and Congress therefore had a rational basis for its enactment.

Under *Lopez*, the Court must first determine whether the conduct regulated fits within one of three broad activities of commerce. Those "three broad categories of activity" include (1) "the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce"; and (3) "those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce."[60]

Courts, including this Court's own sister court in the El Paso Division of the Western District of Texas, have found that the regulated conduct in § 2423(c) substantially affects commerce, as set out in the third category.[61] Many other courts have found the same.

As a reminder, the third category of activity under *Lopez* empowers Congress to regulate "economic class[es] of activities"—even those that are "purely local"—if Congress had a "rational basis" for concluding that those activities "taken in the aggregate, substantially affect interstate commerce."[62] Additionally, under this category, Congress may "regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for

---

[59] *Pendleton*, 658 F.3d at 308.
[60] *Lopez*, 515 U.S. at 558-59.
[61] *Martinez*, 599 F. Supp. 2d at 790.
[62] *Raich*, 545 U.S. at 22 (internal citations and quotation marks omitted).

sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity."[63] In engaging in this inquiry, four factors are relevant:

> "(1) whether the statute regulates economic or commercial activity; (2) whether the statute contains an "express jurisdictional element" that limits the reach of its provisions; (3) whether Congress made findings regarding the regulated activity's impact on interstate commerce; and (4) whether "the link between [the regulated activity] and a substantial effect on interstate commerce was attenuated."[64]

The Court finds sufficient evidence that § 2423(c) regulates economic or commercial activity, as required by the first factor. In *Martinez*, the El Paso Division found that although the alleged illicit sexual conduct contemplated by § 2423(c) is "not itself commercial, 'a worldwide market exists for child prostitution, an activity that is 'quintessentially economic' in nature, and that falls within foreign trade and commerce.' "[65]  The Optional Protocol,[66] which supplemented the internal treaty on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography, recognized that "there is both 'significant and increasing international traffic of children for the purpose of the sale of children, child prostitution and pornography,' as well as 'the widespread and continuing practice of sex tourism[.]'"[67]

The PROTECT Act, which contains § 2423, was passed *in order to implement that Protocol*, and "contains specific language criminalizing commercial sex with

---

[63] *Id.* at 18.
[64] *Morrison*, 529 U.S. at 610–12.
[65] *Id.* (citing *Clark*, 435 F.3d at 1115).
[66] Optional Protocol, May 16, 2000, 39 I.L.M. 1285, 2000 WL 33366017.
[67] *Martinez*, 599 F. Supp. 2d at 807 (citing Optional Protocol (Preamble), May 16, 2000, 39 I.L.M. 1285, 2000 WL 33366017).

minors." [68] Additionally, "[s]ection 105 of the PROTECT Act, where § 2423(c) and § 2423(f) are found, is entitled "Penalties Against Sex Tourism," further evincing the statute's overall economic nature. [69] Accordingly, "the language of the PROTECT Act and the Optional Protocol that § 2423(c) was designed to implement 'all demonstrate that § 2423(c) is primarily designed to combat the human suffering and economic evils of worldwide sex tourism and child prostitution."[70]

The Court also finds that Congress made *extensive* findings regarding the regulated activity's impact on interstate commerce, in compliance with the second factor. Again, the Optional Protocol, and therefore § 2423(c), was intended to effectuate, suggested serious concerns about sex tourism and attempts to criminalize, and therefore limit, international trafficking of and sex with minors.[71]

Additionally, Congress passed § 2423(c) to close legal loopholes that permitted individuals to travel abroad and have sex with minors to avoid prosecutions for statutory rape. Congress had realized that American citizens were using the channels of foreign commerce to travel to countries where "dire poverty and . . . lax enforcement" would allow them to "escape prosecution" for their crimes of child sexual abuse.[72] Section 2423(c) was thus enacted to close that enforcement gap and to "send a message to those who go to foreign countries to exploit children that no one can abuse a child with impunity."[73] Thus,

---

[68] *Id.*
[69] *Id.* (citing H.R. Conf. Rep. 108–66).
[70] *Id.*
[71] Optional Protocol, May 16, 2000, 39 I.L.M. 1285, 2000 WL 33366017.
[72] *Id.* (citing 148 Cong. Rec. 3884).
[73] *Id.* at 311 (quoting 148 Cong. Rec. 3884).

Congress enacted § 2423(c) to regulate persons who use the channels of commerce to circumvent local laws that criminalize child abuse and molestation. And just as Congress may cast a wide net to stop sex offenders from traveling in interstate commerce to evade state registration requirements, so too may it attempt to prevent sex tourists from using the channels of foreign commerce to abuse children.[74]

This is similar to *Raich*, where Congress passed a law prohibiting the purely "the purely local cultivation and use of marijuana, even when that cultivation and use was in compliance with California Law."[75] The Supreme Court, in upholding the law, found that:

"[g]iven the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, 21 U.S.C. § 801(5), and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA."[76]

Thus, like Congress possessed, through its Commerce Clause powers, the authority to close a loophole allowing individuals to locally grow and use pot, Congress possesses, through its Commerce Clause powers and through its passing of § 2423(c), the authority to close "significant loopholes in the law" that allowed persons traveling to foreign countries seeking sex with children's ability to avoid prosecution.[77]

---

[74] *Id.* (citing *Clark,* 435 F.3d at 1116 ("Congress legitimately exercises its authority to regulate the channels of commerce where a crime committed on foreign soil is necessarily tied to travel in foreign commerce, even where the actual use of the channels has ceased."); *N. Am. Co. v. SEC,* 327 U.S. 686, 705 (1946) ("Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature.") (other internal citations omitted).

[75] *Id.* at 806. (citing *Raich,* 545 U.S. at 9).

[76] *Id.* (footnote omitted).

[77] *Pendleton,* 658 F.3d at 310 (citing H.R. Rep. No. 107–525, at 3 (summarizing purpose of adopting language similar to § 2423(c) in Sex Tourism Prohibition Improvement Act)).

This Court also finds that the link between foreign sex with minors and its substantial effects of foreign commerce is not too attenuated, as "leaving non-commercial sex with minors outside of federal control could affect the price for child prostitution services and other market conditions in the child prostitution industry."[78]

Although the illegal sexual conduct contemplated by the noncommercial prong of § 2423(c) is, of course, noncommercial in nature, "[s]uch exploitation can feed the commercial sex tourism industry in many ways."[79]

> For example, noncommercial sexual abuse of minors can drive commercial demand for sex with minors by reinforcing the idea that such conduct is acceptable, or by allowing traffickers to use noncommercial arrangements to entice patrons into engaging in subsequent commercial behavior. By serving as a "gateway," noncommercial conduct can fuel commercial demand . . . . Thus, Congress rationally could have concluded that noncommercial illicit sexual conduct abroad relates to commercial illicit sexual conduct abroad . . . . Because the prohibition on commercial illicit sexual conduct is constitutional, the prohibition on noncommercial illicit sexual conduct is also constitutional as an essential part of that prohibition.[80]

Additionally, "Congress could have rationally concluded that the American appetite for sex with minors abroad substantially affects other aspects of foreign commerce because sex with minors is generally illegal in the United States."[81]

> If Americans believe that traveling to a particular foreign country includes the opportunity for unregulated, noncommercial illicit sexual conduct, they may travel to that country when they otherwise would not, and they may pay more in airfare, lodging costs, vacation packages, or simply stay in the country longer spending money on other things . . . . These substantial collateral effects of American sex tourism, which unquestionably constitute transactions in foreign commerce, thus flow directly from the noncommercial sexual

---

[78] *Id.*
[79] *Lindsay*, 931 F.3d at 863.
[80] *Id.* (internal citations omitted).
[81] *Id.*

activity prohibited by section 2423(c). These collateral effects make noncommercial illicit sexual activity abroad related to the "species of commercial intercourse between the United States and foreign nations."[82]

Finally, with respect to the final factor, this Court notes that the PROTECT Act does not contain a specific jurisdictional element constraining its extraterritorial application.

Because all four factors of the substantially affects category indicate there is a rational basis for Congress to pass § 2423(c), this Court concludes that "there is a rational basis for concluding that leaving non-commercial sex with minors outside of federal control could affect the price for child prostitution services and other market conditions in the child prostitution industry."[83] The Court "has no difficulty concluding that Congress had a rational basis for believing that failure to regulate the non-commercial sexual abuse of minors 'would leave a gaping hole' in the PROTECT Act and its ability to regulate the commercial industry of child prostitution."[84] Accordingly, Muniz-Espinoza's Commerce Clause argument against § 2423(c) fails.

## VI.    CONCLUSION

Although the Supreme Court has yet to direct the lower courts on how to evaluate laws under the Foreign Commerce Clause, most have borrowed the Interstate Commerce Clause's *Lopez* framework. Muniz-Espinoza requests this Court ignore those cases and instead apply a historical tradition analysis as contemplated by *Bruen* in the Second Amendment context. The Court declines the invitation.

---

[82] *Id.* (internal citations omitted).
[83] *See Martinez*, 599 F. Supp. 2d at 807 (citing *Raich*, 545 U.S. at 19).
[84] *Id.* (citing *Raich*, 545 U.S. at 22).

Muniz-Espinoza's approach would have profound consequences on the legal landscape far beyond the context in which it is posed. The Court sees no reason to make those waves before a clear edict is issued from our highest court.

Using the "time-tested" *Lopez* framework, the Court finds that the sexual conduct contemplated by § 2423(c) substantially affects commerce, and, therefore, a rational basis exists for its enactment. Because this Court finds the provision under which Muniz-Espinoza was charged constitutional, his Motion to Dismiss is **DENIED**, and the indictment is upheld.

It is so **ORDERED**.

SIGNED this 16th day of December, 2024.

_____
DAVID  COUNTS
UNITED STATES DISTRICT JUDGE